

**PELTON GRAHAM LLC**

111 Broadway, Suite 1503, New York, New York 10006
T 212.385.9700 ‖ F 212.385.0800 ‖ www.PeltonGraham.com

**Taylor B. Graham, Esq.**  July 13, 2018
Graham@PeltonGraham.com

**VIA ECF**

Honorable Cheryl L. Pollak
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:   *Elvin Mejia v. Wilcox Development Corp., et al.*
              **Civil Action No. 17-CV-04304 (SLT)(CLP)**

Dear Judge Pollak:

    We represent the plaintiffs in the above-referenced matter. This letter is submitted jointly with counsel for the defendants pursuant to the Fair Labor Standards Act and the Second Circuit's decision in *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015). Counsel for the parties respectfully submit that the attached negotiated Settlement Agreement (Exhibit A) constitutes a fair and reasonable compromise of this matter which should be approved by the Court.

**I.    Introduction**

    Named Plaintiff Elvin Mejia ("Mejia" or the "Named Plaintiff") commenced this Action by filing a Collective and Class Action Complaint (Dkt. No. 1, the "Complaint") on behalf of himself and similarly situated employees of defendants Wilcox Development Corp. ("Wilcox"), Stop & Stor New York's Self Storage Leader LLC ("Stop & Stor" and together with Wilcox, the "Corporate Defendants"), Neil Simon ("Simon") and Jeff Henick ("Henick" and together with Simon, the "Individual Defendants" and collective with the Corporate Defendants, the "Defendants") on July 20, 2017 seeking unpaid overtime premium pay pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and the New York Labor Law, § 650 *et seq.* ("NYLL"), as well as damages for wage notice and wage statement violations pursuant to the NYLL and the supporting regulations. (*See* Dkt. No. 1). Defendants Stop & Stor, Henick and Simon filed their Answer to the Complaint on September 15, 2017 (Dkt. No. 15) and Defendant Wilcox filed its Answer to the Complaint on September 20, 2017. (Dkt. No. 18).

    Counsel for the parties appeared for an initial conference before Your Honor on October 18, 2017, wherein the parties discussed certain preliminary issues, including the Plaintiff's anticipated FLSA collective action motion, the employer-employee relationship between Plaintiff and the various Defendants, and the desire to engage in discovery regarding the hours worked by

Case 1:17-cv-04304-CLP    Document 40    Filed 07/13/18    Page 2 of 7 PageID #: 139

MAGISTRATE JUDGE CHERYL L. POLLAK
JOINT FLSA SETTLEMENT FAIRNESS LETTER
PAGE **2** OF **7**

Plaintiff Mejia and the wages paid to Mejia by Defendants. After several weeks of negotiations relating to the form and scope of the notice, the parties reached an agreement to send FLSA § 216(b) notice ("216(b) Notice") to a collective defined as: all persons who worked as construction and laborer employees for Wilcox at any time between December 13, 2014 and December 28, 2017. (Dkt. Nos. 25, 26). Pursuant to the stipulated order, on January 18, 2018, Plaintiffs mailed the 216(b) Notice to a group of forty-six (46) collective members. Plaintiffs Kamil Babulenko, Jacek Cygert, Nestor Rodriguez, Raheem Green, Gino Alexander, Peter Miranda and Jaron Waddell (the "Opt-in Plaintiffs" and, collectively with the Named Plaintiff, the "Plaintiffs") joined the action by filing their consent to become party plaintiff forms with the Court. (*See* Dkt. Nos. 27-33).

Soon after the close of the opt-in period on March 5, 2018, the parties agreed to attempt to resolve the action for the Named and Opt-In Plaintiffs. On March 12, 2018, Plaintiffs issued to Defendant Wilcox their initial discovery demands and exchanged certain documents in Plaintiff's possession. The parties appeared for a status conference before Your Honor on March 30, 2018, wherein the parties agreed to engage in written discovery and to prepare damages calculations. The parties also agreed to participate in a settlement conference, which was scheduled for May 30, 2018 at 10:00 am. Defendant Wilcox responded to Plaintiffs' interrogatories and requests for production of documents and have produced certain payroll records for the Named and Opt-In Plaintiffs. To date, Plaintiffs produced responses and certain documents for the Named Plaintiff and for four (4) of the seven (7) Opt-In Plaintiffs.

To facilitate the settlement negotiations, Plaintiffs created a damages analysis based in part on the records that were produced by Defendant Wilcox and in part on the best recollection of the Plaintiffs regarding their hours and wages. Plaintiffs exchanged the damages analysis and an initial demand with the Defendants on May 22, 2018. Defendant Wilcox provided its own analysis of their pay records to Plaintiffs on May 29, 2018. The parties attended a settlement conference before Your Honor on May 30, 2018, where the parties were able to reach a settlement of the action on an individual basis for the Named Plaintiff and seven (7) Opt-In Plaintiffs.[1]

## II.  The Settlement Accounts for Litigation Risk and Compensates Plaintiffs for Substantial Damages

Throughout this litigation, the parties have had several major points of contention. First, the parties disputed the number of hours worked by the Plaintiffs and whether Plaintiffs performed work for which they were not compensated (i.e., off-the-clock work). Plaintiffs alleged that they routinely worked six (6) days per week, at least eight (8) hours per day, and often times worked more hours depending on the time of year and the status of completion of a project. In addition to not being paid overtime premiums prior to approximately September 2015, certain Plaintiffs also alleged that despite working these additional hours and not always being provided with a full uninterrupted 30-minute lunch break, they were only paid for a maximum of eight (8) hours per day of work. By not receiving pay for such "off-the-clock" hours, Plaintiffs alleged that they were

---

[1] On the evening of May 29, 2018, opt-in plaintiff Cygert indicated that he desired to opt-out of the action. However, because the parties were unable to determine the basis for Mr. Cygert's last-minute decision to no longer participate in the action, the parties agreed to negotiate a resolution which includes Mr. Cygert.

owed unpaid overtime for weeks where the off-the-clock hours were hours over 40 for the workweek. Although Wilcox did not maintain any formal timekeeping system or records for the Plaintiffs, Wilcox contended that Plaintiffs self-reported their hours to their foreman/supervisor and were always paid for all hours worked. Second, the parties disputed whether the wage statements provided with Plaintiffs' wage payments contained sufficient information to satisfy the requirements of NYLL § 195. Finally, Plaintiffs alleged that they were not provided with a wage notice when they were hired or annually prior to February 1, in violation of NYLL § 195. Defendants strongly denied all of Plaintiffs' allegations and argued that Plaintiffs were properly paid.

During the litigation and in preparation for the mediation session, Defendants produced records of wages paid to the Opt-In Plaintiffs by check, which the Defendants contended convincingly established that the Plaintiffs were paid for all hours worked and were largely paid at one and one-half (1.5) times their regular hourly rate for all overtime hours worked. While Plaintiffs would dispute the accuracy and completeness of the records at trial, Plaintiffs recognize that such documents could potentially limit the amount of damages Plaintiffs could recover at trial regarding the overtime and off-the-clock claims if a factfinder credited Defendants' materials in their entirety.

Due to the fact-intensive nature of the Plaintiffs' claims, it is likely that substantive answers to these disputed issues would not be resolved until after extensive additional written and deposition discovery, followed by summary judgment briefing, if not a trial. While document discovery has been exchaged for the Named and Opt-In Plaintiffs, the Plaintiffs intended to file a Rule 23 class certification motion and dispositive motion on certain of the disputed legal issues as described above. Based on these disputes, the parties engaged in good-faith, arm's-length settlement negotiations regarding not only Plaintiffs' FLSA claims, but also their pendent state law claims.

As stated above, Plaintiffs created a damages analysis based on the Defendants' payroll records for the Named and Opt-In Plaintiffs, as well as Plaintiffs' best recollection as to the hours that they worked.

For the unpaid overtime wage claim, which was calculated by taking the difference between the straight-time rates that were paid and the alleged overtime premium that should have been paid for all hours worked by the Plaintiffs over forty (40) each week plus one and one-half (1.5) times the Plaintiffs' hourly rates for all alleged off-the-clock hours, the total alleged damages Plaintiffs calculated equaled $111,710.64. The total alleged damages for the wage notice violations is $35,600.00 and wage statement violations is $38,000.00. Taken together, the total alleged damages for Plaintiffs' claims equaled to $185,310.64. When alleged liquidated damages under the FLSA and NYLL, and statutory interest on the NYLL claims at 9% per annum were then added, the total alleged damages equaled to $336,400.37. In contrast, Defendants calculated the potential damages, assuming Plaintiffs could prove liability at all, to be at most $105,411.00, inclusive of liquidated damages. Defendants utilized Wilcox's records for the Opt In Plaintiff's to reach this number.

A substantial and critical foundation of Plaintiffs' "best-case scenario" for damages is the alleged premise that those Opt-In Plaintiffs who worked after September 2015 were entitled to damages for off-the-clock hours. Defendants vigorously contested that there were any uncompensated hours for any of the Plaintiffs at any time during their respective employment periods. Had the litigation proceeded to the dispositive motion stage, and not been settled, and Defendants prevailed on the legal issue of whether the Opt-In Plaintiffs were entitled to off-the-clock overtime damages, Plaintiffs' best-case scenario for damages would have been substantially reduced.

Given the above, the settlement amount (i.e. $165,000) represents a substantial recovery of the alleged unpaid wages calculated from the Plaintiffs' analysis. The parties believe this is a fair recovery based on the risks associated with establishing the calculated damages, as well as the certainty of receiving compensation for these claims at this fairly early stage in the litigation.

### III.     Settlement Terms

As set forth in the attached Settlement Agreement, the parties have agreed to settle this action for a total settlement amount of $165,000.00 (the "Settlement Amount"). Of that amount, $55,584.51 is payable to Plaintiffs' counsel, representing $876.77 in expenses for counsel's costs for filing and service of the complaint, and mailing the 216(b) Notice, plus one-third (33.33%) of the Settlement Amount, after subtracting those expenses (i.e. $54,707.74). The remaining $109,415.49 is payable directly to Plaintiffs (the "Net Settlement Amount"). The allocation of the Net Settlement Amount will be calculated based on Plaintiffs' alleged individual damages amounts and individual settlement offers from the Defendants at the settlement conference.

Keeping in line with the trend in this Circuit following *Cheeks*, the parties have agreed to a wage and hour release of claims for any claims arising before the effective date of the settlement agreement (i.e. the day the Court approves the Agreement). The parties also did not include a confidentiality provision or a non-disparagement provision.

The Second Circuit in *Cheeks* questioned the propriety of an FLSA settlement agreement in another case that included: (1) "a battery of highly restrictive confidentiality provisions" (2) an overbroad release that would waive both current and future claims and (3) a fee for plaintiffs' attorneys of "between 40 and 43.6 . . . without adequate documentation to support such a fee award." The Settlement Agreement before Your Honor, however, (1) does not contain a restrictive confidentiality provision; (2) does not contain a release which is one-sided or is to be applied to future claims and (3) the Plaintiffs' attorneys' fees are standard (i.e. 1/3). Most importantly, and unlike the settlement agreement at issue in *Cheeks,* the Settlement Agreement is available to Your Honor to explore and to assess whether it was likely the "fair result of a balanced negotiation, in which Plaintiffs were represented by able counsel." *Lola*, 2016 U.S. Dist. LEXIS 12871, at *4.

### IV.     Plaintiffs' Attorney's Fees and Expenses

As set forth in the attached Affidavit of Taylor B. Graham, Esq. (Exhibit B), as of July 13, 2018, Plaintiffs' counsel had spent more than 169 hours in prosecuting and settling this matter,

resulting in a lodestar of $43,994.69. Plaintiffs' counsel had spent $876.77 in actual litigation costs. The portion of the settlement amount that plaintiffs seek as attorney's fees (i.e. $54,707.74) represents one-third (1/3) of the settlement amount, after subtracting the actual litigation costs, which is slightly more than the lodestar amount. In addition, this amount is consistent with what was agreed upon between Plaintiffs and their counsel in their retainer agreements and the consent to become party plaintiff forms filed with the Court. The retainer agreement between Plaintiffs and their counsel set forth a contingency fee of one-third (1/3) of any settlement, plus reimbursement of actual litigation costs.[3]

The hourly billing rates utilized by Plaintiffs' counsel in calculating the lodestar are within the range paid to attorneys of similar experience and professional focus in the Eastern District of New York. In fact, similar rates have been approved in connection with a recent wage and hour settlement in this district. *See Hall v. Prosource Techs., LLC*, 14-cv-2502(SIL), 2016 U.S. Dist. LEXIS 53791 at *38-41 (E.D.N.Y. April 11, 2016). Accordingly, Plaintiffs' counsel submits that the attorney's fees component of the settlement is fair and reasonable.

**V.     The Court Should Find That the Settlement Is Fair and Reasonable**

A FLSA settlement should receive judicial approval where it is "fair and reasonable." *See Cheeks*, *supra*; *Wolinsky v. Scholastic, Inc*. 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012).[4] Generally, there is a "strong presumption in favor of finding a settlement fair," as "the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Crabtree v. Volkert, Inc.*, No. 11–0529–WS–B, 2013 WL 593500, at *3 (S.D. Ala. Feb. 14, 2013). Moreover, "[c]ourts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes." *In re Penthouse Executive Club Compensation Litig.*, No. 10-cv-1145, 2014 U.S. Dist. LEXIS 5864, at *22 (S.D.N.Y. Jan. 14, 2014) (noting that the inherent adversarial nature of a litigated FLSA case is adequate indicator of fairness of settlement). In considering whether a settlement is fair and reasonable, the principal question is "whether the agreement reflects a 'reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching.'" *Le v. SITA Info. Networking Computing USA, Inc.*, No. 07-CV-86, 2008 WL 724155, at *1 (E.D.N.Y. Mar. 13, 2008) (*quoting Lynn's Food,* 679 F.2d at 1354). Although the FLSA places "limits on an employee's ability to waive claims . . . for fear that employers would [otherwise] coerce employees into settlement and waiver," *Wolinsky*, 900 F. Supp. 2d at 335 (alteration in original) (internal quotation marks omitted), "these concerns are not as relevant when the plaintiffs no longer work for the defendant, as is the case here." *Cisneros v. Schnipper Restaurant LLC*, 2014 U.S. Dist. LEXIS 2111, *3 (S.D.N.Y. Jan. 8, 2014).

---

[3] The Opt-In Plaintiffs did not sign a retainer agreement but their Consent to Become a Party Plaintiff form contains a similar provision regarding Pelton Graham's intention to seek one-third of the overall recovery as attorneys' fees.

[4] The parties note that *Cheeks* relies heavily on the Eleventh Circuit's decision in *Lynn's Food Stores, Inc. v. United States Dep't of Labor*, 679 F.2d 1350, 1355 (11th Cir. 1982), and that the Eleventh Circuit itself has subsequently contemplated that the supervision doctrine laid out in that case may apply only where a "compromise" of an FLSA claim has occurred. *Silva v. Miller*, 307 Fed. Appx. 349, 351 (11th Cir. 2009).

Here, there is no question that the settlement did not come about because of "overreaching" by the employer. To the contrary, the settlement was the result of vigorous arm's-length negotiations with the assistance of Your Honor at the May 30, 2018 settlement conference. The parties are represented by counsel experienced in wage and hour law who duly counseled their respective clients on the benefits and risks of continued litigation. As explained above, the settlement represents a substantial recovery under the Plaintiffs' best-case scenario theory of the damages. The negotiated settlement is fair and reasonable when considered in the context of the litigation risks faced by Plaintiffs and the risk that recovery after trial would be less than the negotiated settlement amount. The litigation risks faced by Plaintiffs which render the negotiated settlement a fair and reasonable one include but are not limited to: 1) the risk that the Plaintiffs would be unable to establish that they performed work "off-the-clock" for which they were not paid; 2) the risk that the factfinder would determine based on the records produced by the Defendants that the Plaintiffs were properly compensated for all overtime hours worked; 3) that the Plaintiffs were provided with accurate wage statements with their wage payments; and 5) that there are individualized issues that preclude the Plaintiffs from proceeding to trial on a class or collective action basis.

Given these risks, settlement at this stage of the case unquestionably constitutes the most efficient and effective conclusion to this litigation. Defendants asserted legitimate substantive defenses which highlighted substantial risk to Plaintiffs' ability to continue this FLSA litigation. *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 115 (2d Cir. 2013) (FLSA protects only minimum wage and overtime). Arm's-length negotiations between knowledgeable counsel followed, culminating in a negotiated resolution.

\*   \*   \*   \*   \*

As demonstrated above, the settlement is a result of substantial negotiations and compromise by both parties. The parties believe that the settlement is completely fair, reasonable, and adequate to the Plaintiffs and respectfully request that the Court approve the Agreement.

We appreciate Your Honor's attention to this matter. Please contact the undersigned counsel for the parties should you have any questions regarding this submission.

Respectfully submitted,

| | |
|---|---|
| **PELTON GRAHAM LLC** | **FEATHER LAW FIRM, P.C.** |
| By: /s/ | By: /s/ |
| Brent E. Pelton | David S. Feather |
| Taylor B. Graham | 666 Old Country Road, Suite 605 |
| 111 Broadway, Suite 1503 | Garden City, NY 11530 |
| New York, NY 10006 | Telephone: (516) 745-9000 |

Telephone: (716) 881-4902

*Attorneys for Plaintiffs*

*Attorneys for Defendant Wilcox Development Corp.*

**Milber Makris Plousadis & Siden, LLP**

By: */s/*

John J. Byrnes
1000 Woodbury Road, Suite 402
Woodbury, NY 11797
Telephone: (516) 712-4000

*Attorneys for Defendants Stop & Stor New York's Self-Storage Leader LLC, Jeff Henick and Neil Simon*